MATTER OF S——

In SECTION 9 Proceedings, Act of September 11, 1957

A-11335687

A-11338032

*Decided by Assistant Commissioner July 31, 1958*

Adjustment of status—Section 9, Act of September 11, 1957—Eligibility of spouse—Eligibility not affected by beneficiary's immigration status in U.S.— Good moral character not a requirement for eligibility—Determination of unavailability of visa.

(1) Whether in or outside the United States on July 1, 1957, the "spouse" of the principal beneficiary under section 9 of the Act of September 11, 1957, does not qualify for the benefits of that section unless the marital status came into being prior to July 1, 1957.

(2) Statute does not require that the beneficiary must have maintained any particular immigration status in the United States. Hence, violation or termination of nonimmigrant status is not a ground of ineligibility under section 9.

(3) A visa is regarded as unavailable within the meaning of section 9 if the quota to which the beneficiary is chargeable was oversubscribed between the filing of the visa petition and September 10, 1957, the day prior to the effective date of the Act of September 11, 1957.

(4) An applicant for adjustment of status under section 9 of the Act of September 11, 1957, is not required to establish good moral character as an element of eligibility.

## BEFORE THE ASSISTANT COMMISSIONER

**Discussion:** This case has been certified to the Assistant Commissioner, Examinations Division.

The applicants, a 27-year-old male and his 30-year-old spouse, are natives and citizens of Australia. They last entered the United States at San Francisco on May 20, 1957, at which time they were admitted as nonimmigrant visitors for pleasure for a period expiring on August 20, 1957. On June 20, 1957, a visa petition seeking classification under section 203(a)(1)(A) of the Immigration and Nationality Act was filed on behalf of the male applicant. The petition was approved on June 25, 1957. Thereafter, the male applicant accepted employment elsewhere. On July 16, 1957, both applicants were informed that inasmuch as they had abandoned their nonimmigrant status they could no longer be considered in lawful

100

status and were given until July 3, 1958, to depart voluntarily from the United States.

On November 26, 1957, the applicants made application for adjustment of status to that of aliens lawfully admitted for permanent residence under the provisions of section 9 of the Act of September 11, 1957. In order to qualify for adjustment of status under this section an applicant must establish that he (1) was physically present in the United States on July 1, 1957; (2) is the beneficiary of an approved visa petition for immigrant status under section 203(a)(1)(A) of the Immigration and Nationality Act filed on his behalf prior to September 11, 1957, or is the spouse or child of such a beneficiary; (3) is admissible to the United States, except for the fact that an immigrant visa is not promptly available for issuance to him because the quota of the quota area to which he is chargeable is oversubscribed; and (4) he applies on Form I-507 for adjustment of status.

The benefits of section 9 are made available to the "spouse * * * physically present within the United States on July 1, 1957" of an alien physically present within the United States on July 1, 1957, who is the beneficiary of an approved visa petition for immigrant status under section 203(a)(1)(A) of the Immigration and Nationality Act filed on his behalf prior to September 11, 1957. It is noted that, unlike the statutory provision in section 9 relating to the spouse *outside* the United States of a principal beneficiary, no specific date is fixed as to when the marriage must have occurred by reason of which such relationship arose. It might be argued, therefore, that with respect to the spouse in the United States, the date of marriage is immaterial and may occur before or after July 1, 1957, and before or after the approval of the petition by reason of which the husband obtained first preference classification. It is concluded, however, that notwithstanding the failure to specifically provide a date prior to which the marriage must have occurred for the spouse in the United States, the language of section 9(B) quoted above clearly evidences a congressional intent that the relationship and the physical presence within the United States must both be in existence on July 1, 1957. It follows, therefore, that the requirement that the marriage must have occurred prior to July 1, 1957, is applicable to the spouse in, as well as outside, the United States. In the instant case, the marriage of the applicants to each other occurred in Australia on May 20, 1957; the visa petition of which the male applicant is the beneficiary was approved June 25, 1957, and both applicants were physically present in the United States on July 1, 1957. Accordingly, the female applicant meets the requirements of section 9(B) of the Act of September 11, 1957.

101

As both of the applicants ceased being in lawful nonimmigrant status by taking employment prior to the filing of their instant applications, it might be argued that they had no "status" to adjust within the meaning of section 9. That section does not require the beneficiary to have entered in any particular status under the immigration laws. Consequently, the violation of their immigration status by taking employment does not render them ineligible.

It remains to be decided as of what date is the unavailability of a quota to be determined. Were we to interpret the statute to require that the availability of an immigrant visa be determined currently, that is, when the application for adjustment under section 9 is adjudicated, it would result in nullifying section 9 for those first preference beneficiaries otherwise qualified under that section whose petitions were approved prior to July 1, 1957, since under section 12 of the Act of September 11, 1957, immigrant visas (nonquota) are currently available to them. This would deny the benefits of section 9 to the vast majority of the first preference beneficiaries intended by Congress to be benefited. Such interpretation would result in requiring such beneficiaries to leave the United States in order to obtain their immigrant visas since not alone would they be ineligible for adjustment of status to permanent residence under section 9, as above stated, but also ineligible for adjustment under section 245 of the Immigration and Nationality Act being nonquota immigrants other than $101(a)(27)(A)$ of the act. Another consequence of such interpretation would be that since the principal beneficiary would be ineligible for section 9 adjustment, the derivative spouse and children could not adjust their status under section 9 and would be required to leave the United States in order to acquire permanent resident status.

The legislative history behind sections 9 and 12 discloses that they were originally introduced as separate bills, were separately considered, and later incorporated into the single bill which became the Act of September 11, 1957. In fact, H.R. 8123 provided special nonquota visas only for second and third preferences, similar provision for first preferences being included in the Senate bill later adopted in conference. It is for the reasons stated that the provisions of sections 9 and 12 overlap.

A statute is to be interpreted so as to give meaning and purpose to each portion thereof avoiding results which are unreasonable and not within the apparent intent of the Congress. Each separate section is to be read and interpreted so as to carry out the manifest purpose sought to be achieved, to give reasonable meaning and scope to each, and to the act in its entirety. Applying these precepts to the Act of September 11, 1957, and to give full meaning and purpose to sections 9 and 12, the visa requirement provision is

102

interpreted to mean that the unavailability of a visa because of oversubscription refers to the period between the filing of the visa petition and September 10, 1957, the day prior to the effective date of the Act of September 11, 1957, such unavailability being determined in accordance with visa availability lists covering such period. Such interpretation will not deny to eligible beneficiaries the benefits of section 9 because they may also qualify for benefits of section 12 and will fully accomplish the objectives sought to be achieved by the legislation under discussion.

Report No. 33 of the Visa Office of the Department of State, dated May 22, 1957, and current from that date until Report No. 34, dated September 20, 1957, reflects that a first preference quota visa was unavailable during that period for filing applications under section 245 of the Immigration and Nationality Act.

The applicants do not fall within any of the excluding provisions of section 212(a) of the Immigration and Nationality Act. While they have been found to have committed adultery, as will be more fully set forth below in the discussion of good moral character, they have not been convicted of such offense, have not made an admission of such offense within the meaning of section 212(a)(9), nor would such admission if made be a ground of inadmissibility under the well-settled rule of the Service on the admission of such offense. Both applicants have been examined by an officer of the U.S. Public Health Service and found to be free of any certifiable defects.

The record reflects that each of the applicants was previously married, such marriages having been terminated in Australia by divorce decrees dated December 12, 1955, and March 28, 1956. The male applicant was the defendant in the proceeding against him, the female applicant being named co-respondent and co-defendant. In the divorce action involving the female applicant, she was named as the defendant and the male applicant the co-respondent and co-defendant. The divorce was granted the plaintiff in each case by reason of the adultery committed by the defendant with the co-defendant named.

If an applicant for adjustment of status under section 9 of the Act of September 11, 1957 is required to establish good moral character, the adultery committed by the applicants must be considered and a determination made whether it occurred during whatever period, if any, good moral character is required to be established. In the absence of a statutory requirement that good moral character be established, such a requirement may be imposed if the statute provides that the action be taken in the exercise of discretion (*Matter of H——R——*, A-10463832, 7 I. & N. Dec. 651), or impliedly or expressly authorizes its implementation by regulations and the regulations promulgated thereunder prescribe such a requirement.

103

We will first determine the applicability to the Act of September 11, 1957, of section 101(f)(2) of the Immigration and Nationality Act which provides that no person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was one who during such period has committed adultery. If applicable, an applicant under section 9 would not be precluded thereby from establishing good moral character since neither that section nor the regulations promulgated thereunder provide a period during which good moral character shall be established (*Matter of N——*, A-4532071, 7 I. & N. Dec. 368). However, under the principle of *expressio unius est exclusio alterius*, we conclude that section 101(f) is not applicable since section 14 of the Act of September 11, 1957, provides that only definitions contained in section 101 (a) and (b) of the Immigration and Nationality Act shall apply.

We shall now determine whether there is any requirement that an applicant under section 9 establish good moral character. That section is silent as to such a requirement. Unlike other sections of the same act, it does not provide that the action shall be taken in the exercise of discretion. While it does provide that the action be taken pursuant to such terms and conditions as may by regulations be prescribed, the regulations promulgated, 8 CFR 245, do not require that good moral character be established. Thus, we conclude that good moral character is not germane.

The record establishes that the applicants have met all of the statutory and regulatory requirements of section 9 of the Act of September 11, 1957. Accordingly, their applications for adjustment of status to that of aliens lawfully admitted for permanent residence will be granted.

It is noted that the applicants were not notified of the proposed certification as is provided for in 8 CFR 7.15. As the District Director's and Regional Commissioner's decisions are both favorable, this procedural omission in no way prejudiced the applicants' case and no useful purpose would be served in returning the case for compliance.

**Order:** It is ordered that pursuant to section 9 of the Act of September 11, 1957, the applications of B——G——S—— and E—— J——S—— for adjustment of status to that of aliens lawfully admitted for permanent residence be and the same are hereby granted.